HENRY SANFORD V. THE STATE.

No. 20028.   Delivered December 14, 1938.
Rehearing Denied February 8, 1939.

The opinion states the case.

*W. E. Tumlin,* of Marshall, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; penalty assesed at confinement in the penitentiary for fifty years.

The indictment alleges that the appellant unlawfully, voluntarily and with malice aforethought, killed Ben Williams by shooting him with a gun.

The State's testimony, coming from the witness, Charles Pippin, Jr., is to the effect that on the night of March 26, 1938, he witnessed the shooting of the deceased, a negro about 60 years of age, by the appellant, who was also a negro. The killing occurred at the Hightower store at a place known as the Old Elysian Fields in Harrison County, Texas. The deceased came to the store about 8:15 o'clock at night and sat down in a chair "pretty close" to where a checker game was in progress. The deceased tried to borrow a dime from the witness and others in the store but failed to do so. The appellant, commonly known as "Hoecake Sanford," came into the store later on in company with Dock Mathis. Appellant purchased two boxes of sardines and Mathis bought two cigars, after which they left the store at different times. No words were spoken between the appellant and the deceased at that time. The witness walked out on the porch of the store and noticed the appellant with something in his hand which had the appearance of a walking stick. About that time the deceased came walking out of the store and said, "What you want, boy?" The witness did not know who the deceased was speaking to. Appellant then spoke up and said, "Come on out here." The deceased walked down the steps, when the appellant suddenly whirled and fired a gun. The deceased threw up his hands and fell. As he fell, he said, "Oh, Lordy," which was all the witness heard. According to the witness, the deceased had no weapon about him at the time, and was not making any threatening gesture or any kind of demonstration at the time the gun was fired. The witness ran away but later returned to the

scene of the tragedy. After being shot, the deceased never talked or said a word, but laid on the ground where he was shot. After some 20 or 30 minutes his body was placed on the porch.

W. L. Little, a constable of the Elysian Fields precinct, testified that he received information about nine o'clock on the night of March 26, 1938; that he went to the Hightower store and there found the body of the deceased, Ben Williams, lying on the porch. The officer examined the body and found that the deceased had been shot in the stomach just below his navel. The deceased was dressed in overalls, and no weapon of any kind was found about his body. After the tragedy, the constable and a deputy sheriff went to the home of the appellant. The constable called to the appellant and he answered from the cotton patch back of his house. When asked about the gun with which he did the shooting the appellant replied that it was in the garden. Appellant accompanied the officers to the garden and got the gun which was laying across the fence. The gun was a double-barrel 12-gauge shotgun and was loaded with No. 4 shot in both barrels. Besides the two shells in the gun, the appellant had one shell in his pocket. When arrested, the appellant had two pair of "crooked" dice in his pocket. The officer testified without objection that the appellant had a bad reputation for "crap-shooting"; that he had been locked up for cattle theft, and had also been caught making whisky and "shooting craps."

The witness, Grady Kelly, testified that about 7:30 o'clock on the night of the tragedy, the appellant appeared at Furrh's store in Elysian Fields and purchased from the witness four shotgun shells for a 12-gauge shotgun; that these shells were identical with those introduced in evidence upon the trial as having been taken from the appellant. The witness saw the appellant later on during the evening. At that time the appellant was in the store belonging to the father of the witness, which store was across the street from that at which the witness worked. The appellant was in possession of a double-barrel 12-gauge shotgun and was engaged in a conversation with the brother of the witness. The witness went over to where the appellant was and asked him, "What was the trouble." Appellant replied: "Not anything." The witness then said: "You better get away with that shotgun; I heard you had some trouble with Ben Williams." Appellant told the witness that he was going away, and the witness then went back to the store.

Sam Cook testified that he was engaged in a game of

checkers in the Hightower store on the night that the deceased was killed; that the deceased came into the store and had a conversation with Charles Pippin, Jr., during which he asked Pippin to lend him a dime. Appellant and Dock Mathis came into the store and later left. About ten minutes thereafter, the witness heard a gun fire and ran to the door. He went back in the store, got Mr. Hightower and then went out to where the deceased had been shot. No one else was there at the time. No weapon of any description was seen about the body of the deceased.

Appellant testified that he was 29 years of age; that he had known the deceased for about eight years; that he had had some difficulty with him about two or three years ago, but that no ill feeling existed between them. The deceased and another negro had been making some whisky. They missed some of it and accused the appellant of having taken it. According to the appellant, on "Saturday evening," the deceased wanted him to pay for the whisky and tried to get appellant to drink some of it. However, appellant drank very little of the whisky. From the testimony of the appellant we quote: "All at once one of them came out with a pistol and Ben (deceased) ran up to cut me and I broke and run and I ran out of the field with Ossie Fields. * * * I never had a dealing with him any more. That difficulty happened sometime before this matter came up."

About sundown on the night of the tragedy, the deceased was engaged in a "crap game" and had lost his knife. Appellant was playing cards at the time. The deceased accosted the appellant about the knife and said he was going to kill him. A scuffle ensued but two boys separated them. Appellant then went on to town, borrowed a shotgun and bought some shells for it. He was planning to go home, but decided to go to "Old Town" and get something to eat. According to the appellant, the "crap game" was played about a mile and a half from the place of the shooting. Upon arriving at the Hightower store for the purpose of getting something to eat, the appellant saw the deceased who was in the store. From the appellant's testimony we quote: "I stopped at the door and told Mr. Oscar Hightower to give me some sardines and talked to him and he got me some crackers, and then Ben jumped up and started towards me and I whirled then and jumped out and he told me to wait. I told him I didn't want to have anything with him. I saw him coming down the steps. I was putting the shells in and I said, 'Stop Ben' and he said, 'Oh, hell, f—— you'; and

when I raised the gun up to shoot that trigger guard came off. I shot him and left."

The shooting occurred about two hours after the appellant and deceased had engaged in a fight over the knife which deceased claimed the appellant had won from him in the "crap game." Appellant testified that the deceased bore the reputation of being a "bully" and a fighter among the negroes; and that he was afraid of him, especially after the difficulty at the "crap game" at which time deceased told appellant that he was going to kill him.

O. L. Hightower, called as a witness by the appellant, testified that he had conducted a general mercantile store at Elysian Fields and that the appellant and deceased were both customers of his; that from his knowledge and acquaintance of them, both the deceased and the appellant had a good reputation in the community. On the night of the killing, the deceased came into the store, walked to the back of it and sat down. He had been sitting there about an hour when the appellant came in and bought some sardines. Dock Mathis came in the store and bought some cigars. Neither the appellant nor Mathis spoke to the deceased. After they had both walked out of the store the deceased left. The witness then heard the report of a shotgun. The witness testified that he heard no talking among the parties and had no intimation that there was any trouble between appellant and the deceased.

Appellant introduced a number of witnesses who testified to his good reputation in the community. However, the State introduced witnesses who gave testimony to the effect that the appellant's reputation was bad and that of the deceased was good.

The rights of the appellant were fully protected in the charge of the court against which no objections were addressed.

The only bill of exception found in the record is that complaining of the action of the court in overruling the appellant's motion for new trial. From our examination of the bill, we fail to perceive any error.

Deeming the evidence sufficient to support the conviction, the judgment is affirmed.

## ON MOTION FOR REHEARING.

KRUEGER, JUDGE.—Appellant has filed a motion for a rehearing in which he insists that we erred in holding the evidence

sufficient to sustain his conviction. He also complains of the severe penalty assessed him. We have again carefully examined the record but remain of the opinion that a proper disposition was made of the case on original submission. The punishment received by appellant was a question for the jury which, under the facts, we would not be authorized to disturb.

The motion for a rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.